Filed 9/27/21

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----


| | |
|---|---|
| THE PEOPLE, | C088566 |
| Plaintiff and Appellant, | (Super. Ct. No. F16256B) |
| v. | |
| FINLEY FULTZ, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Nevada County, Thomas M. Anderson, Judge. Reversed with directions.

Xavier Becerra and Matthew Rodriquez, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Assistant Attorneys General for Plaintiff and Appellant.

Diane Nichols, under appointment by the Court of Appeal, for Defendant and Respondent.


Isaac Zafft was brutally shot to death for nothing more than being in the wrong place at the wrong time. The extent of defendant Finley Fultz's involvement is unknown

1

because the only people who can provide evidence in that regard are defendant's alleged accomplices. The story the accomplices tell is as follows: Throughout the first half of 2014, Nathan Philbrook and Daniel Devencenzi stole marijuana from multiple marijuana farms and greenhouses Philbrook's wife, Amber N., helped locate on Google Earth, which provides aerial views of land throughout the world. In July 2014, Philbrook invited defendant to a marijuana theft with him and Devencenzi. Philbrook and defendant drove to California from Nevada in defendant's truck and Devencenzi followed in his truck. Philbrook and Devencenzi used their cell phones at various times along the journey, defendant did not. Just after midnight, the group approached a greenhouse in Penn Valley; a greenhouse Philbrook and Devencenzi stole marijuana from a week or so before. The group intended to steal marijuana they thought may still be there. Philbrook entered the greenhouse's back door, while Devencenzi stayed outside the back door and, according to Philbrook, defendant walked to the front of the greenhouse. Zafft was asleep on the greenhouse's floor. Zafft awoke to the sound of Philbrook's presence and saw the laser sight attached to Philbrook's AR-15 style handgun. Zafft ran out the front door of the greenhouse where defendant was located. Defendant shot the AR-15 rifle he possessed five times. Zafft was hit multiple times and died. The group then fled back to Nevada, all the while Philbrook and Devencenzi used their cell phones and defendant did not. Upon their return to Nevada, defendant admitted to Amber he delivered the fatal shots, and Philbrook made statements inculpating defendant as the shooter.

The investigation that commenced took several years and continued during trial. The Nevada County Sheriff's Department became aware of defendant's, Philbrook's, and Devencenzi's involvement in Zafft's murder because of an anonymous tip Amber supplied several months after the murder. Deputies subsequently conducted three interviews with her; the recording of the second interview was lost, as were photographs of Amber's shoes. After defendant's arrest and the filing of a complaint, the Nevada

2

County District Attorney's Office placed an undercover officer in defendant's jail cell for the purpose of eliciting incriminating statements from him concerning the murder, violating his Sixth Amendment right to counsel. Then during a police interview, defendant's invocation of his Fifth Amendment right to counsel was ignored.

During the pendency of defendant's, Devencenzi's, and Philbrook's joint criminal prosecution, Devencenzi and Philbrook pled guilty in exchange for reduced sentences. The prosecution failed to inform defendant that those bargains were offered as package deals, contingent on both Devencenzi and Philbrook accepting the plea bargains and fulfilling the bargains' terms for either to benefit. The prosecution also failed to inform defendant the offers were contingent upon Philbrook and Devencenzi including in a written factual statement that they and defendant participated in a robbery and defendant killed Zafft. When making those bargains, Devencenzi and Philbrook agreed to be interviewed by the prosecution, which the prosecution failed to audio record. Finally, the prosecution continued its investigation of the case against defendant during trial and did not disclose material it intended to use against him until shortly before it was to be offered into evidence.

Based on the government's conduct throughout the investigation and trial, the trial court made several credibility findings rejecting the prosecution's innocent explanations for the constitutional violations. The trial court then dismissed the case against defendant finding there was no possibility he could receive a fair trial considering the nature of the evidence against him and the violations surrounding his accomplices' pleas and interviews.

At its core, this People's appeal concerns the level of gamesmanship the prosecutor can engage in during a criminal prosecution before that gamesmanship is so unconstitutional the pending murder charge against a defendant must be dismissed because no fair trial could possibly be held. The standard for dismissal is high. (*United States v. Morrison* (1981) 449 U.S. 361, 365 [66 L.Ed.2d 564, 568-569] ["Our approach

3

has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense.  Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy [of dismissal] in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial"].)

In this case, the trial court believed no fair trial could be had because the prosecution placed Devencenzi and Philbrook under a strong compulsion to testify to specific facts, thereby tainting their testimony beyond redemption.  (*People v. Medina* (1974) 41 Cal.App.3d 438, 449-456.)  We conclude that finding was made in error. Because the record demonstrates the trial court believed a fair trial could be had in the absence of the *Medina* error, we believe it appropriate to reverse the judgment and remand the matter to the trial court to again tailor relief to neutralize the taint resulting from the prosecutor's other misconduct.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

*The Investigation*

On July 7, 2014, at approximately 3:00 a.m., Zafft's body was found with four gunshot wounds delivered from a distance of at least two feet away.  The shell casings and bullet fragments found at the crime scene belonged to .223-caliber bullets, which typically are fired from a low-caliber but high-powered gun.  Several shoe prints were found in and around the greenhouse, and a fingerprint was found on the back door of the greenhouse.

In November 2014, an anonymous tip was called into the Washoe County Sheriff's Department in the state of Nevada regarding Zafft's murder.  As a result of that

4

tip, Nevada County Deputy Sheriff Russell Greene interviewed Amber twice in November and once in December 2014. During those interviews, Amber told Deputy Greene that Philbrook, Devencenzi, and defendant were responsible for Zafft's murder, while also minimizing her own involvement in the events leading to Zafft's death. Deputy Greene's report from one of the interviews indicates he may have taken photographs of Amber's shoeprint.[1] Deputy Greene also interviewed Jeff Sorce in December 2014, who relayed statements Philbrook had made to him about Zafft's murder.

Deputy Greene received recordings of each of Amber's interviews from the Washoe County Sheriff's Department and wrote reports regarding those interviews. Two of the videos were booked into evidence, one was not. Deputy Greene could not explain why the recording of Amber's second interview was not booked into evidence or capable of being located. He claimed to have not known the recording was missing until June 2017 when the prosecution was preparing for the preliminary hearing. At that time, he looked through his own records for the misplaced recording. Initially, Deputy Greene testified he contacted the Washoe County Sheriff's Department when he noticed the recording was missing, only to later testify he contacted them when asked to do so by the prosecution in November 2018. When explaining his typical process of booking evidence, Deputy Greene initially said he booked the recordings after writing the reports concerning those recordings, he then said it was typical for him to book all of the evidence at once.

---

[1] The report indicated Deputy Greene and his partner asked to take pictures of Amber's shoes. The report does not indicate whether those pictures were ever taken. At a hearing, the prosecution acknowledged defendant alleged photographs of Amber's shoeprints were lost, but the prosecution never addressed that concern and no evidence was ever admitted as to whether a photograph was actually taken or the location of that photograph.

Amber gave Deputy Greene the phone numbers for Philbrook, Devencenzi, and defendant during her interviews. Deputy Greene then wrote a search warrant for a data dump[2] of the cell phone tower nearest to the greenhouse where Zafft was murdered. Both Devencenzi's and Philbrook's cell phones were shown to have used that tower around the time of Zafft's murder. Defendant's cell phone did not use that tower. Deputy Greene wrote a report conveying that information in March 2015.

Based on the phone numbers Amber gave him, Deputy Greene also wrote a search warrant for Devencenzi's, Philbrook's, and defendant's cell phones. Information was returned on that warrant in February 2015. No substantive information was returned on the search of defendant's cell phone because he owned a cell phone through Cricket Wireless, which retained usage records for only 180 days. Philbrook's and Devencenzi's records showed they called each other near the time of the murder. Deputy Greene wrote a report conveying this information. Deputy Greene did not recall looking for calls between defendant and Philbrook at the time he discovered calls between Philbrook and Devencenzi.

Thereafter, the investigation stalled until June 2015 when Nevada County Sheriff Sergeant Robert Jakobs was assigned to the major crimes unit. At that time, he was asked to analyze Philbrook's and Devencenzi's phone records to determine the cell phones' locations around the time of Zafft's murder. Based on Sergeant Jakobs's analysis, he concluded Philbrook's and Devencenzi's phone records showed they traveled from Philbrook's house in Nevada to various locations in Butte and Nevada Counties in California the day before the murder, were near the site of the murder when the murder occurred, and traveled back to Philbrook's house in Nevada after the murder.

---

[2] A data dump warrant is a warrant issued to collect data; in this case, a warrant to collect data from certain cell towers.

## II

### *Pretrial Proceedings*

On July 12, 2016, the Nevada County District Attorney filed a felony complaint alleging Devencenzi, Philbrook, and defendant murdered Zafft during a robbery. The information further contained an allegation that defendant personally used a firearm, causing Zafft's death. Defendant was arrested on July 13, 2016, in Butte County. He was thereafter transported to the Wayne Brown Correctional Facility, where he was housed until July 18, 2016, when he appeared in Nevada County Superior Court. While housed at the Wayne Brown Correctional Facility, defendant was placed in a jail cell with a government agent from an out-of-county agency who attempted to elicit incriminating statements from defendant related to Zafft's murder. After being transferred to the Nevada County Jail for booking, Nevada County Sheriff's deputies interviewed defendant. A portion of that interview occurred before the deputies informed defendant of his right to counsel, a portion was held after defendant waived his right to counsel, and a third portion was held after defendant invoked his right to counsel.

Upon a later motion, the trial court granted defendant's request to suppress all his statements made to any government agent. Specifically, the trial court found defendant's Sixth Amendment right to counsel attached when the complaint against him was filed. Thus, the government agent placed in defendant's cell at Wayne Brown Correctional Facility for the purpose of eliciting incriminating statements resulted in a violation of defendant's right to counsel because defendant did not waive his right to counsel under the Sixth Amendment before those statements were elicited. The trial court further found statements defendant made to deputies once transported to the Nevada County Jail should be suppressed. As for the initial part of his interview, the trial court suppressed all

7

statements made before defendant was advised of his *Miranda*[3] rights. Further, defendant invoked his right to counsel under the Fifth Amendment during his interrogation at the Nevada County Jail, making all statements elicited after that invocation a violation of his Fifth Amendment right. The trial court found all of defendant's statements made between his *Miranda* waiver and his invocation were fruits of that Sixth Amendment violation and also suppressed them.[4]

Before defendant's trial began, Devencenzi and Philbrook accepted plea bargains. Devencenzi pled guilty to voluntary manslaughter in exchange for 11 years in prison. Philbrook pled guilty to voluntary manslaughter and robbery, and admitted a prior strike offense in exchange for 23 years in prison. Both Devencenzi and Philbrook agreed to testify truthfully against defendant as a term of their written pleas.

Not disclosed to defendant were emails containing the contents of plea negotiations between the prosecution and Devencenzi and Philbrook concerning conditions of their plea bargains not included in the written plea forms. In an email, Assistant District Attorney Christopher Walsh offered the plea bargains as package deals. Devencenzi's attorney later testified that his client understood and accepted the bargain as a package deal, contingent upon both men fulfilling the terms of their bargains to benefit therefrom. Walsh testified he did not believe the offers remained open as package deals when they were accepted. First, he would have put on the record at the plea hearings that the deals were package deals if that is what the prosecution had agreed to. Also, after the offers were made as package deals, the prosecution team did not believe Devencenzi, based on his jail calls, intended to accept the offer and the prosecution would have been willing to accept Philbrook's plea in isolation. Walsh, however,

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

[4]    The People do not challenge the suppression of these statements on appeal.

understood how Devencenzi would think his plea bargain was a package deal with Philbrook's plea bargain because that had been discussed leading up to the April 2018 plea hearing. Walsh testified that in hindsight, he should have done more to correct the misunderstanding.

Also in the emails sent to Philbrook's and Devencenzi's attorneys, Walsh stated as a condition of their plea bargains that each man would have to stipulate to a factual basis that included they and defendant participated in a robbery and that defendant was the person who shot and killed Zafft. Philbrook's statement, which was attached to his written plea bargain, contained these facts. Devencenzi's statement, which was also attached to his written plea bargain, provided that when Philbrook and defendant walked separately around the greenhouse, Devencenzi heard multiple gunshots, then he ran away. He did not specify who delivered the shots.

As part of Philbrook's and Devencenzi's plea agreements, they each sat for an hour to an hour and one-half interview with the prosecution team. When district attorney investigator Dominic La Fountain retrieved the video recordings of those interviews, he discovered that no audio had been recorded with the visual recording. Investigator La Fountain testified that multiple people had access to the video recording equipment for the interview room in which Philbrook and Devencenzi were interviewed. The visual recording is always activated and continuously records. When an interview takes place, the interviewer switches on the audio component to the recording, which Investigator La Fountain did in this case. During the interviews, members of the sheriff's department and district attorney's office were present in the viewing room, where the recording equipment is kept, to watch the interviews. Investigator La Fountain discovered after the interviews that somebody had altered the recording equipment and muted the audio recording feature. Thus, even though Investigator La Fountain turned on the audio recording switch, the equipment was muted and could not record any of the audio. Investigator La Fountain did not know about this feature nor did he know who muted the

9

audio or when the audio was muted. After discovering the muted audio, Investigator La Fountain wrote a summary of each interview and highlighted any inconsistencies he thought existed between Philbrook's and Devencenzi's written statements and their interviews.

## III

### *Trial Proceedings*

### A

### *Evidence Elicited At Trial*

David B. testified he grew marijuana in a greenhouse in Penn Valley. In early July 2014, most of the marijuana in the greenhouse was stolen while David was sleeping in his house on the same property. A week after the theft, David hired Zafft to work in the greenhouse. Zafft slept in the greenhouse at night. Just before 1:00 a.m. on July 7, 2014, David heard three gunshots close to his house. He called the Nevada County Sheriff's Department because he could not reach Zafft on his cell phone. Several hours later, a sheriff's deputy arrived and instructed David to inspect the greenhouse. David found Zafft's body just outside the front door to the greenhouse. Zafft had been shot once in the face, once in the shoulder, once in the chest, and once in the buttocks.

Investigator La Fountain testified that the weapon used to murder Zafft was never located. Five shell casing for .223-caliber bullets, however, were found. Those type of bullets are typically fired from a rifle but could also be fired from a pistol. It appeared the weapon was fired from the driveway outside the front of the greenhouse. Philbrook's fingerprint was discovered on the back door to the greenhouse.

Philbrook testified that in July 2014, he lived in Nevada with his then-wife Amber. He was best friends with Devencenzi and had known defendant for two years, but they were not good friends. In early July, he and Devencenzi stole 75 pounds of marijuana from the greenhouse where the murder occurred. Amber found the greenhouse for them and knew their purpose was to steal marijuana from it. According to Philbrook, Amber

10

helped him find multiple locations to steal marijuana from and helped process the marijuana he stole.

Philbrook testified that a week or so after the first theft, defendant called him saying he needed money. Philbrook told defendant he knew of a place they could steal marijuana and the two agreed to do so. The place Philbrook had in mind was the greenhouse Amber had previously found for him, and he and Devencenzi had already stolen from. Defendant and Philbrook agreed to drive to California together with Devencenzi following them. Defendant and Philbrook planned to carry weapons and Devencenzi would act as a decoy to elicit the attention of any following police officer.

Philbrook testified that after hitting the road, the group got gas and then drove straight to the greenhouse without stopping. Defendant was in possession of an AR-15 rifle Philbrook stored for defendant at Philbrook's house and Philbrook possessed an AR-15 style pistol. Philbrook's pistol held .223-caliber bullets, as did defendant's rifle. Devencenzi did not possess any weapons.

Philbrook testified that the group arrived at the greenhouse property after dark and they walked together to the greenhouse. Philbrook took his pistol, defendant took his rifle, and Devencenzi took nothing. Philbrook walked through the back door of the greenhouse while defendant and Devencenzi waited outside the back door. Philbrook saw that all the mature plants were gone and all that was left were small plants not worth stealing. Philbrook left the way he came and spoke to defendant about what to do next. They decided they were going to look around the greenhouse before leaving. Philbrook went into the greenhouse again through the back door and defendant walked around to the front.

Philbrook testified that while inside the greenhouse, he heard rustling. He looked to where the sound came from and saw a person stand up. At first, the person walked toward Philbrook, but once the person saw the laser sight on Philbrook's gun, the person turned and ran out the front door of the greenhouse. Philbrook heard a shot and saw a

11

muzzle flash from outside the greenhouse. He then heard loud screaming and two to four more shots.

Philbrook testified that he ran back to the truck, as did Devencenzi and defendant. Philbrook and defendant got into defendant's truck and Devencenzi got into his own truck, and they all drove away. Philbrook did not see Devencenzi following them, so Philbrook called Devencenzi to tell him he was going the wrong way and to turn around. The group headed back to Nevada, stopping once for gas in Cisco Grove.

Philbrook testified that when they got back to Nevada, all three went inside Philbrook's house. Devencenzi took off his clothes, as did Philbrook who also took a shower. When Philbrook got out of the shower, Devencenzi was gone and defendant told him all their clothes were in a burn pile. Defendant was wearing different clothes than he had been wearing previously. Before leaving Philbrook's house, defendant expressed concern that Devencenzi would say something about what happened and said they "[m]ight have to get rid of him." Before defendant left, Philbrook told him to come back to get rid of the rifle used to murder Zafft.

Philbrook testified that defendant returned to his house later that day. He took the rifle, a sledgehammer, and a grinder into Philbrook's garage and Philbrook heard pounding. Defendant then borrowed a backpack and Philbrook's four-wheel, all-terrain vehicle and was gone for two hours. Defendant then returned with the backpack and Philbrook never saw the rifle again. Amber was there when defendant returned and asked them what had happened during the marijuana theft. Defendant told her he fired a warning shot at the person running out of the greenhouse and the guy started screaming, so defendant fired a few more times to shut him up.

Philbrook testified his plea bargain was made in exchange for his truthful testimony and that he was telling the truth. Defendant cross-examined Philbrook extensively about his relationship with Devencenzi, drug use, criminal history, inconsistent statements, and the plea he entered as revealed in the written plea agreement.

12

Amber testified under a grant of immunity. She admitted to being the person who reported the anonymous tip. She testified that the day the group left for California, she saw defendant at the house she shared with Philbrook. After they left, she fell asleep, but was awakened by defendant, Philbrook, and Devencenzi knocking on the door in the early morning hours. She went back to bed, and when she later awoke, Philbrook was the only person at the house. She asked him multiple times what happened during the marijuana theft and he eventually told her shots were fired and he thought somebody got hurt. Upon further questioning, Philbrook told her he did not know if someone died but that he, defendant, and Devencenzi burned all their clothes and shoes. Philbrook told her he went to the greenhouse he and Devencenzi had stolen from a couple of weeks before, but this time someone approached him with a machete but then ran away and shots were fired. He said they left the greenhouse but he had to call Devencenzi because Devencenzi drove the wrong direction when leaving. Amber searched online and found that the person shot had died.

Amber testified that later that day she saw defendant come back to her and Philbrook's house. Defendant said he took his truck to a car wash to make sure there was no dirt left on it. Defendant told her the person in the greenhouse was approaching Philbrook before he turned to face defendant. Defendant fired a shot but the person continued to approach defendant, so defendant shot the person. The person then started screaming, so defendant had to shoot him again to shut him up. She told defendant he had killed somebody and he said "well, he was coming at me with a machete." That same day defendant left the house with a small backpack on a four-wheel, all-terrain vehicle and was gone for a few hours.

Amber testified she helped Philbrook find outdoor marijuana farms to steal from on Google Earth in Butte and Nevada Counties. She would trim the marijuana he brought back. She, however, did not help Philbrook find the location of the site where the murder happened. Philbrook and Devencenzi told her they stumbled upon it and they

13

would be lying if they said otherwise. Amber knew Philbrook armed himself when stealing marijuana. According to Amber, Philbrook told people about the murder and his role in it. Sorce testified about one of those times, which occurred when Sorce tried to buy an AR-15 rifle from Philbrook. At that time Philbrook told Sorce he no longer had the rifle because defendant had used it to kill somebody when he and defendant robbed a marijuana greenhouse. A criminalist testified the bullets found at the greenhouse were not fired from the AR-15 style handgun owned by Philbrook.

Devencenzi's conditional examination was played for the jury. At the time his testimony was taken, he was dying of terminal cancer.[5] Devencenzi testified he met Philbrook in prison in 2005 or 2006 and had known him since. They became good friends and in 2009 Devencenzi was Philbrook's best man at his wedding to Amber. Devencenzi met defendant through mutual friends, but had only met him a few times before the murder.

Devencenzi testified that he and Philbrook had stolen from multiple marijuana farms in 2014. They looked for marijuana farms to steal from by looking at Google Earth in the general area of Highway 49 and Highway 20. Amber often helped Philbrook look up sites to steal from and knew Philbrook went to California to steal marijuana. In early July 2014, Philbrook called Devencenzi and invited him to steal marijuana from a marijuana farm. Philbrook told Devencenzi later that day that defendant was going to go with them to California for the marijuana theft. When defendant arrived, they talked generally but not regarding the planned theft. An hour or two after defendant arrived, the group left. Amber knew the group was going to California to steal marijuana. Devencenzi did not see any weapons but knew Philbrook owned various types of guns and had armed himself during other marijuana thefts.

---

[5]     Devencenzi died during the briefing stage of this appeal.

Devencenzi testified he drove in his truck and Philbrook drove with defendant. On the way, they stopped to get gas and eat at a Jack in the Box. The men then returned to the trucks they were previously occupying. Devencenzi followed defendant and Philbrook because he did not know where he was going. Over the next few hours, the men drove around Butte County looking for potential marijuana sites and stopping on the side of the road occasionally to talk. The group then drove to Highway 49 and the Grass Valley area looking for potential marijuana sites. They made several stops, but ultimately waited for nightfall to steal marijuana.

Devencenzi testified that once it got dark, the group pulled over to the side of the highway to check a greenhouse nearby. Devencenzi was not comfortable with the plan because he realized this was the property he and Philbrook had stolen marijuana from a week before. Devencenzi expressed his concern but Philbrook said they were going to check anyway and started walking toward the greenhouse. As the group climbed over a cattle gate, Devencenzi saw defendant holding what appeared to be a long rifle.

Devencenzi testified that defendant walked to the front of the greenhouse while Philbrook walked to the back door and entered the greenhouse. Devencenzi could not see either man. As Devencenzi walked closer to the greenhouse, he heard a gunshot sounding as if it came from a long rifle. Devencenzi dove to the ground and stayed there for 10 to 15 seconds before he heard three more shots. He had no idea who fired the weapon. Devencenzi then got up and ran toward his truck. On the way, he heard one more gunshot.

Devencenzi testified he got to the trucks first, and was soon followed by defendant and Philbrook. Philbrook told them they were leaving. Defendant did not say anything. Devencenzi was starting his truck but by the time he started it, defendant and Philbrook had left in an unknown direction. Devencenzi then drove away in the wrong direction. After a call between Devencenzi and Philbrook, Devencenzi turned around and caught up to Philbrook and defendant. They stopped for gas before going back to Philbrook's

15

house in Nevada. When they got back to Philbrook's house, Amber was there. All three of them went inside and agreed they were going to burn their clothes. They did not talk about what had happened. Devencenzi left his clothes and drove to his father's house.

Devencenzi testified he agreed to pled guilty to a manslaughter charge in exchange for his truthful testimony. His understanding was that he would testify to the best of his knowledge and there would be a possibility of him getting an 11-year sentence. Defendant cross-examined Devencenzi extensively regarding his drug use, criminal history, inconsistent statements, and the plea he entered with the prosecution as revealed in the written plea agreement.

The last prosecution witness to testify was Sergeant Jakobs. He testified about Philbrook's and Devencenzi's phone records, which he reviewed during the investigation. The phone records establish the men traveled from Philbrook's house in Nevada to various locations in Butte and Nevada Counties in California the day before the murder, were near the site of the murder when the murder occurred, and traveled back to Philbrook's house in Nevada after the murder.

B

*Mistrial Ruling*

Following the above testimony by Sergeant Jakobs, the prosecution attempted to elicit evidence pertaining to an extended search of defendant's cell phone records. During an Evidence Code section 402 hearing, the following facts were revealed: On the first day of trial, the prosecution requested a search warrant from a different judge than the one assigned to defendant's case for defendant's cell phone records. Unlike the prior search of defendant's cell phone records, this search revealed defendant and Philbrook made calls to one another when Philbrook claimed he and defendant spoke before and after traveling to California for the marijuana theft. Sergeant Jakobs prepared a report reflecting the fact of the phone calls and the prosecution disclosed it to defendant the morning of Sergeant Jakobs's testimony. The information revealed by the search of

16

defendant's phone records caused the prosecutor to look again at Philbrook's phone records that were already disclosed to defendant. In Philbrook's phone records, the prosecution also saw evidence of the calls between defendant and Philbrook, although that fact had not been previously disclosed to defendant in the report prepared with the disclosure of Philbrook's phone records.

Based on this discovery violation, the prosecution's failure to disclose the package nature of Philbrook's and Devencenzi's plea bargains, the unavailability of recordings of significant interviews, and in light of the government's violations of defendant's right to counsel, the trial court declared a mistrial. The trial court found the discovery violations resulted in defendant's inability to cross-examine witnesses and rejected the prosecution's assertions the errors occurred without purpose. Explaining the discovery violation regarding defendant's cell phone records, the trial court reasoned the delayed investigation and discovery of defendant's phone records led to the detection of incriminating calls. While those calls were also detectible in Philbrook's phone records, the prosecution never investigated that avenue nor informed defendant it would rely on that evidence from Philbrook's phone records, even though it highlighted other equally ascertainable evidence from Philbrook's phone records as underpinning its case.

IV

*Posttrial Proceedings*

Defendant filed a motion for reconsideration of his motion to dismiss the case against him based on emails detailing the plea negotiations between the prosecution and Devencenzi and the prosecution and Philbrook given to him following the trial court's mistrial ruling. In defendant's motion for reconsideration, he argued the prosecution denied him a fair trial by placing defendant's accomplices under a strong compulsion to testify in a particular fashion by requiring them to state as part of their factual basis that they were " part of a robbery with the other two charged co-defendants, and . . . that defendant Fultz shot and killed the victim."

17

In its written opposition to the motion for reconsideration, the prosecution stated the plea bargains between itself and defendant's codefendants were the product of months of informal and written negotiations. During several in-person meetings, codefendants' attorneys represented to the prosecution how the robbery and murder of the victim occurred, which the prosecution then summarized in the emails. The proposed plea bargains were expressly conditioned upon " 'truthful testimony' " and providing a " 'truthful account,' " which would be left to the judge hearing their testimony to determine. "The prosecutor felt it was important the record was clear as to what the co-defendants said took place, and that it come directly from them, so that at a later time a judge would have a starting point to decide if they were truthful or not in their testimony. Importantly, the offer was *not* conditioned on their testimony being consistent or the same as a police report, a particular statement or even the stipulation -- only that they testify truthfully. [¶] It is important to note these e-mails, and the discussions that took place were at that point only informal negotiations. These were not intended to be, and were not, the written plea agreements entered into in court that finalized the complete terms of the plea agreement. . . . The prosecutor listed what it [*sic*] considered to be key points that should be included in the factual basis for the plea *based upon* what defense counsel represented their clients said took place."

The trial court granted defendant's motion to dismiss. In its order, the trial court noted it had previously granted defendant a mistrial based on several discovery violations and violations of defendant's fundamental rights. It was now considering defendant's motion for reconsideration of his motion to dismiss because, since the mistrial ruling, newly discovered evidence revealed an additional discovery violation and *Medina* error.

In total, the court made nine findings summarizing the government's constitutional and discovery violations. First, "[t]he government placed an undercover officer in a jail cell with the Defendant, after the Complaint had been filed against him, to try to elicit incriminating information in violation of law. [Citations.] This is established law and it

18

was purposefully violated by the government." Second, "there was an unequivocal violation of the Fifth Amendment, where the government refused to acknowledge the Defendant's assertions of his right to counsel by continuing to question him after he requested the questioning stop and he be allowed to talk to a lawyer."

Third, "[d]uring the course of the government's investigation and trial preparation, they failed to preserve or provide critical evidence related to the accomplices. Specifically, the CD, which provided an audio recording of the interrogation of the accomplice, Amber . . . , was 'lost.' Amber . . . testified that, in addition to other acts in furtherance of crimes, she helped plan the thefts from marijuana greenhouses. Officer Green[e] testified at the hearing on this matter and offered no explanation as to how or why this CD 'disappeared.' " Fourth, "[t]he government also reported 'losing' the photograph(s) taken of accomplice [Amber's] shoes in November of 2014. Presumably, this evidence was to be used to compare to footprints from the crime scene. However, it was not retained by the investigator and [was] unavailable for discovery to the defense. No explanation was offered for this loss of evidence." Fifth, "the audio portion of the interviews with co-defendants Philbrook and Devencenzi, conducted after their change of plea and before their trial testimony, somehow was 'muted' so that no part of the discussion could be relayed. The government's explanation for the loss was essentially that 'an unknown person changed the "settings" on the recording device.' " The trial court found the excuses offered by the prosecution for the third through fifth violations "unpersuasive and not credible under all the circumstances of this case."

Sixth, "[t]he mistrial was ordered after it was discovered that the prosecution had failed to inform the defense that the plea bargains offered to the co-defendants Philbrook and Devencenzi were offered as a 'package deal,' a violation [pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*)]. . . . It includes, as a prosecutor's duty, disclosure of evidence that would impeach the testimony of a material witness." Seventh, "[p]rior to the <u>Brady</u> violation, the prosecution was determined to

have violated discovery rules by offering late discovery of evidence they intended to use at trial." Eighth, "[t]he email from [Walsh] to the two co-defendants placed the accomplice witnesses under a strong compulsion to testify in a particular fashion. This results in tainted testimony." And ninth, "[t]he failure to provide the actual email document that set-out the terms of the plea bargain proffered by the prosecution was an additional Brady violation. That document was significant and critical to cross-examination."

When deciding the proper sanction, the trial court acknowledged "[e]ach of the errors described above may be treated individually. Nonetheless, the Brady errors and the [compulsive plea bargain] errors are of such stature that they may be grounds for dismissal independent of the other grounds. However, the cumulative effect of the series of fundamental Constitutional violations by the government in this case also must be evaluated." The trial court concluded that because the nature of the prosecution's case rested on uncorroborated accomplice testimony, the "extraordinary incidents of misconduct by the government in this case direct the [trial] Court to the only reasonable sanction" of dismissal. Quoting *Barber v. Municipal Court* (1979) 24 Cal.3d 742 and *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, the trial court found anything short of dismissal would fail to deter the government from engaging in future misconduct. "Therefore, under all the circumstances of this case, after a review of the entire record, the many arguments of counsel, and the testimony presented at the hearings and the trial, the Court finds that the individual and cumulative effect of the government's repeated misconduct requires that the case be dismissed."

The People appeal. We stayed the trial court's order pending resolution of the matter in this court.

## DISCUSSION

The People's contentions can be broken into two parts: First, the People argue many of the trial court's findings in its dismissal order are legally inaccurate or

20

unsupported by the evidence. The People assert that if we conclude even one of those findings was made in error, we must reverse the trial court's decision because its order dismissing defendant's case was based on a cumulative prejudice analysis of the prosecutions' violations. Second, the People argue that, even if all the trial court's findings of constitutional and discovery violations are upheld or we conclude the trial court's finding of dismissal can be analyzed in the absence of some supportive findings, the dismissal sanction was excessive and inappropriate.

We conclude the trial court's findings are supported, except for its finding pursuant to *Medina*, regarding Philbrook's and Devencenzi's plea bargains. In light of this conclusion, we further conclude remand is appropriate.

I

*Review Of The Trial Court's Findings*

The People do not challenge the trial court's findings that defendant's Fifth and Sixth Amendment rights to counsel were violated when deputies placed an undercover officer in defendant's jail cell for the purposes of eliciting incriminating statements after a complaint was filed against him, and thereafter ignored his requests for counsel during an interrogation. The People attack the trial court's other findings arguing they were either unsupported by substantial evidence or contrary to law. We disagree in most respects.

A

*The Prosecution Violated Its Brady Obligations*

The trial court found the prosecution violated its *Brady* obligations by failing to disclose to defendant the full extent of the plea bargains it struck with Philbrook and Devencenzi. This included that the plea bargains were offered as package deals and that the emails sent from the prosecution to Philbrook and Devencenzi included terms not disclosed in the written plea form. The People argue the trial court erred because

21

Philbrook's and Devencenzi's plea bargains were not package deals, and, even if they were, the information included in the emails was not material under *Brady*. We disagree.

Under *Brady*, " '[t]he prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment.' " (*People v. Stewart* (2020) 55 Cal.App.5th 755, 769.) *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87 [10 L.Ed.2d at p. 218].) "The [United States Supreme Court] has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) We review a *Brady* claim de novo but give great weight to the trial court's factual findings when supported by substantial evidence. (*Ibid*.)

1

*Substantial Evidence Supports The Trial Court's Factual Finding The*

*Offers To Philbrook And Devencenzi Were Package Offers*

The People urge us to reweigh the evidence pertaining to the nature of Philbrook's and Devencenzi's plea bargains and conclude their bargains were not package deals. But the People do not analyze the relevant question for a *Brady* analysis. The question is not whether Devencenzi's and Philbrook's plea bargains were package deals for the purpose

22

of their future rights under those bargains.  Thus, the People's citations to *People v. Shelton* (2006) 37 Cal.4th 759 and *In re Ibarra* (1983) 34 Cal.3d 277 are inapplicable. The relevant question is what defendant's codefendants believed the prosecution's offers were when they accepted them and when Philbrook and Devencenzi testified such that it influenced Philbrook's and Devencenzi's testimony in a way that provided impeachment evidence to defendant.  We review that factual question, and the trial court's determination of it, for substantial evidence.  (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1042.)

Under the substantial evidence standard of review our role does not involve a reevaluation of the evidence.  Rather, we presume the existence of every fact the court could reasonably have deduced from the evidence.  (*People v. Brooks* (2017) 3 Cal.5th 1, 58; *People v. Sandoval* (2015) 62 Cal.4th 394, 423.)  "The standard is deferential:  'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' " (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681, italics omitted.)  We do not consider the credibility of witnesses or reweigh the evidence, and we draw all reasonable inferences, and resolve all conflicts, in favor of the order.  (*People v. Miller* (1994) 25 Cal.App.4th 913, 919-920.)

It is true, as the People argue, the written plea bargain forms filled out and signed by Philbrook and Devencenzi do not contain the term that the bargains were package deals with one another.  It is also true that neither of Devencenzi's or Philbrook's attorneys or the prosecution stated on the record at the plea hearing that their plea bargains were package deals.  However, the evidence shows Devencenzi's counsel believed and told Devencenzi his plea bargain was a package deal with Philbrook's plea bargain.  Walsh also testified that he could understand why Devencenzi's counsel

23

believed the bargains were package deals. According to Walsh, the bargains were offered as package deals leading up to their acceptances in April 2018. While the prosecution did not believe Devencenzi was going to accept the offer based on jail calls the prosecution listened to, that was the only fact cited by Walsh as his basis for believing the offers were not package offers. From Walsh's testimony, the prosecution never actually communicated to Philbrook or Devencenzi its "view" that "at least a month or several weeks prior to April 5th, 2018, that package deal requirement was not a part of the plea or our offer." Through Walsh's testimony, the prosecution's last communication with Philbrook and Devencenzi before the offers were accepted was that the offers were package offers. While the prosecution was willing to offer a non-package offer to Philbrook if Devencenzi rejected the package offer, Devencenzi never rejected the package offer and the accepted offers were the package offers.

This is true regardless of what was contained in the January 2018 email to Devencenzi's defense counsel. The People spend much time arguing this email, and the September 2017 email to Philbrook, were preliminary negotiations that did not constitute the terms of Philbrook's and Devencenzi's plea bargains. Regardless, the testimony of Devencenzi's defense attorney and the prosecution demonstrate the package nature of the offer communicated in the January 2018 email survived what may be a preliminary negotiation and was understood to be part of the bargains entered. Thus, substantial evidence supports the trial court's determination that Philbrook's and Devencenzi's plea bargains were understood to be package deals.

The People's reliance on *Badgett* and *Homick* is misplaced. (*People v. Homick* (2012) 55 Cal.4th 816; *People v. Badgett* (1995) 10 Cal.4th 330.) In *Badgett*, the court reviewed multiple discussions between the parties to determine whether a witness's immunity agreement at trial included a term that she would testify to specific facts. (*Badgett*, at pp. 358-364.) Importantly, the discussion where the specific facts were referenced as the basis for the witness's testimony occurred in relation to discussing a

24

future immunity agreement to be worked out later.  (*Id.* at pp. 358-359, fn. 7.)  Every communication following that initial discussion required the witness to tell only the truth and the witness testified she was required to tell only the truth as part of her grant of immunity.  (*Id.* at pp. 359-361.)  Thus, the court concluded the initial discussion where the prosecutor referenced specific facts was merely a preliminary negotiation and did not constitute the actual immunity agreement.  (*Id.* at pp. 361-362.)

Similarly, in *Homick*, the witness's attorney stated on the record that the parties understood the witness would testify he was not the shooter, but that understanding "*is not a binding agreement, that is just an understanding we have.*"  (*People v. Homick*, *supra*, 55 Cal.4th at p. 863.)  In response to the defendant arguing this statement showed an additional term to a witness's plea agreement, our Supreme Court concluded "[t]his [was a] preliminary understanding, nonbinding even at the time it was expressed, [and did] not supplant or supplement the actual terms of the later agreement."  (*Ibid.*)

Here, in contrast, Walsh testified the last offers communicated to Devencenzi and Philbrook were package offers, which they accepted.  Further, Walsh understood why Devencenzi believed his plea bargain was a package deal and recognized he could have done more to clarify the prosecution's position.  Thus, unlike *Badgett* and *Homick*, the prosecution's offer of package deals was more than preliminary negotiations and was the substance of the bargains offered by the prosecution.

2

*Failure To Disclose The Nature Of The*

*Prosecution's Plea Offers And The Emails Violated Brady*

The People do not argue the package offers were unfavorable to defendant or that their suppression occurred through a nongovernment action.  Instead, the People argue only that the package nature of the plea offers was not material under *Brady* because the package offers had little impeachment value in light of the extensive cross-examination

25

of Devencenzi and Philbrook, and because their testimony was corroborated by Amber's testimony and independent evidence. We disagree.

As described, evidence is material under *Brady* " ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1042.) While the favorability of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively and evaluated in the context of the entire record. (*In re Brown* (1998) 17 Cal.4th 873, 887.) The mere possibility that the suppressed evidence might have helped the defense or might have affected the outcome of the trial does not establish materiality. (*People v. Hoyos* (2007) 41 Cal.4th 872, 922.) " ' "In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. . . ." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 177.) A new trial is generally not required when other evidence corroborates the witness's testimony. (*Salazar*, at p. 1050.)

As the trial court noted, the prosecution's case was built on the testimony of defendant's codefendants and an alleged accomplice, all of whom testified in exchange for a reduced sentence or a grant of immunity. Thus, we reject the People's argument that Amber's testimony served to corroborate Philbrook's and Devencenzi's testimony that defendant accompanied them to the marijuana theft and was the person who shot Zafft. First, Amber's testimony also suffers from credibility concerns given the leniency she received in exchange for it. (CALCRIM No. 226.) Second, and most importantly, Amber could reasonably be found to be an accomplice to the crimes charged. Evidence established Amber was involved in the marijuana theft conspiracy by finding marijuana farms and greenhouses for Philbrook to steal from, including the one at which Zafft worked. She also knew Philbrook armed himself when stealing marijuana and knew

26

Philbrook and Devencenzi were going to California at the time of the crime to steal from a marijuana farm. Given Amber's likely status as an accomplice, her testimony cannot serve to corroborate Philbrook's and Devencenzi's testimony. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1222 [the testimony of an accomplice cannot corroborate that of another accomplice].)

The objective testimony cited by the People also cannot render the *Brady* violation immaterial. The People point to Philbrook's fingerprint on the back door to the greenhouse, the phone records demonstrating Philbrook and Devencenzi traveled from Nevada to California and were in the area of the murder at the time of the murder, and the ballistic evidence demonstrating the bullets at the greenhouse were not fired from the AR-15 style handgun owned by Philbrook. This objective evidence does not corroborate Philbrook's and Devencenzi's testimony that defendant accompanied them to the marijuana theft in California or was the person who shot Zafft. Philbrook's fingerprints corroborate that he was in the greenhouse, the cell phone location evidence corroborates that Devencenzi and Philbrook traveled the course Devencenzi testified to and they both were at the greenhouse at the time of Zafft's murder. The ballistic evidence corroborates the handgun did not cause Zafft's death.

But Devencenzi and Philbrook were the only people to testify that defendant was the one who possessed the AR-15 style rifle during the murder. No evidence outside of Philbrook's testimony established that defendant owned an AR-15 style rifle. Even then, Philbrook testified that it was Philbrook who stored the rifle for defendant and gave this AR-15 rifle to defendant for the marijuana theft and murder. All other evidence pointed to Philbrook as the owner of the AR-15 rifle. Thus, contrary to the People's argument, no independent evidence corroborated Philbrook's and Devencenzi's testimony that defendant possessed the AR-15 rifle that shot and killed Zafft or that defendant was even at the greenhouse when Zafft was murdered.

This leaves the People's contention that the package nature of the plea deals did not add impeachment value beyond that explored by defendant at trial. Indeed, the People argue the package nature of the plea bargains did not provide Philbrook and Devencenzi with a motive to concoct a story apart from that already derived from their own desires to avoid a murder conviction. Not so. The package nature of the plea deals served to link Philbrook's future to Devencenzi's future. (*In re Ibarra*, *supra*, 34 Cal.3d at pp. 287-289 [a package plea offer is a conditional plea offer made to multiple defendants that becomes unconditional only if all of those defendants accept it].) Devencenzi's attorney testified it was his and Devencenzi's understanding the plea deals could be unwound if either he or Philbrook failed to live up to the terms. By accepting the plea deals as a package, the trier of fact could reasonably infer that Philbrook's and Devencenzi's longstanding and close relationship before the theft and murder continued through defendant's trial. The additional impeachment value, in light of the uncorroborated testimony of Devencenzi and Philbrook, make it reasonable that a different outcome would have resulted had the jury known of it.

For these same reasons, the People's failure to disclose the emails demonstrating the package nature of the plea bargains was a *Brady* violation. Further, the withholding of the emails was made even more material because of the other information contained in them. The parties do not analyze the materiality of the emails, except as far as they reveal the plea bargains were package offers. But as the trial court noted, the emails also include the prosecution's dictation of facts required to be part of Devencenzi's and Philbrook's factual recitation of the crime. Regardless of whether this dictation rose to the level of a *Medina* violation, it unquestionably served as impeachment evidence. Accordingly, the prosecution's failure to disclose the package nature of the plea bargains and the emails of plea negotiations violated *Brady*.

B

*The Prosecution Did Not Commit Medina Error*

Under *Medina*, the use of coerced testimony results in "a denial of the fundamental right to a fair trial in violation of federal constitutional principles." (*People v. Medina*, *supra*, 41 Cal.App.3d at p. 456.) But, unlike our analysis of the *Brady* errors in the preceding section, our focus here is on the actual agreement entered into by the parties, not what a witness presumed the agreement to be. While a witness presuming an agreement requires testimony to specific facts would impeach that witness's testimony, it would not violate due process and require exclusion of the witness's testimony unless the agreement itself required testimony to those specific facts. Thus, under the relevant law, to offend due process, " 'the bargain [must be] expressly contingent on the witness sticking to a particular version [of her story].' " (*People v. Reyes* (2008) 165 Cal.App.4th 426, 434, quoting *People v. Garrison* (1989) 47 Cal.3d 746, 771.)

A witness who testifies pursuant to a plea agreement does not give coerced testimony if the agreement requires only that the witness testify truthfully and completely and does not require that the witness testify in a particular fashion. (*People v. Medina*, *supra*, 41 Cal.App.3d at pp. 454-456; *People v. Pinholster* (1992) 1 Cal.4th 865, 939, overruled on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) "[A]lthough there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is [constitutional]." (*People v. Allen* (1986) 42 Cal.3d 1222, 1252.) "[W]hen the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial." (*Id.* at pp. 1251-1252.)

We independently review the record in its entirety to determine whether a third party's plea agreement was coercive, thus depriving defendant of a fair trial. (*People v. Badgett, supra*, 10 Cal.4th at p. 350.) "In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)

The People contend the trial court erroneously determined the prosecution committed *Medina* error by expressly conditioning Philbrook's and Devencenzi's pleas on their testimony to specific facts. We agree.

Initially, we note the factual findings of the trial court are well taken. In the trial court's view, the prosecution's emails conditioned a plea agreement on Devencenzi and Philbrook relating specific facts, thus placing them under a strong compulsion to testify in a specific way. Those facts were that they were involved in a robbery with each other and defendant and that defendant was the person who shot and killed Zafft. The record also supports the conclusion the prosecution intended these statements to be the truth Philbrook's and Devencenzi's future testimony would be judged against -- the prosecution said as much in its opposition to defendant's motion to dismiss. Further, the prosecution insisted Devencenzi and Philbrook not be sentenced until after their testimony in defendant's trial in case "for some reason, a condition of the plea, testifying truthfully, was not followed up with, that then the prosecution could make a motion to withdraw the plea." The judge sitting at defendant's trial, however, would preside over Philbrook and Devencenzi's sentencing hearings and determine whether Philbrook and Devencenzi testified to the truth.

At the end of the day, however, the plea bargains did not expressly require Philbrook and Devencenzi to testify consistent with the facts given to them by the prosecution or to the statements they attached to their plea bargains. The written plea bargains and emails required Devencenzi and Philbrook to testify only to the truth. In the

30

event they testified inconsistent with the statements attached to their bargains or with the prosecution's expectation, an inevitable hearing on the prosecution's motion to withdraw the pleas would produce the communications between the parties and demonstrate to the judge determining Philbrook's and Devencenzi's truthfulness at trial the full scope of their credibility. In that event, Philbrook and Devencenzi could be found to have complied with the terms of their plea bargains, i.e. they testified truthfully at trial, even though they did not testify consistent with the statements attached to their bargains or the prosecution's expectations. Further, Philbrook and Devencenzi both testified their plea bargains required them to testify to the truth and nothing else.

" 'The California Supreme Court has refused to extend *Medina* beyond the instance in which a plea agreement expressly requires consistency between accomplice testimony and a prior statement.' " (*People v. Reyes*, *supra*, 165 Cal.App.4th at p. 434.) In *Garrison*, the court held that "unless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina* . . . are not violated." (*People v. Garrison*, *supra*, 47 Cal.3d at p. 771.) "The court reiterated this language -- with emphasis on the words '*expressly contingent*' -- in its most recent decision on the subject. (*People v. Boyer* (2006) 38 Cal.4th 412, 456.)" (*Reyes*, at pp. 434-435.)

This case is hard to compare to case law, including the cases cited by the People. Typically, a defendant alleges error because the prosecution conditioned the testifying witness's plea agreement on the witness's truthful testimony at trial and consistency with prior statements it understood to be the truth. For instance, in *People v. Fields* (1983) 35 Cal.3d 329, defense counsel elicited from a prosecution witness that her immunity was conditioned on testimony consistent with her prior statement. On redirect, however, the witness made clear her prior statement was the truth, the prosecutor had asked her to testify to the truth, and she was never asked to testify to specific facts. (*Id*. at pp. 359-360.) Our Supreme Court explained, the record suggested, at most, the witness understood she was obliged to recount her prior statement because it was the truth. Our

31

Supreme Court found the evidence insufficient to conclude that the grant of immunity required the witness to testify in accord with a prior statement regardless of its truth. (*Id.* at pp. 360-361.)

Similarly, in *Boyer*, two witnesses were granted immunity on condition and agreement that they testify truthfully (or be subject to perjury prosecution). (*People v. Boyer, supra*, 38 Cal.4th at p. 455.) The agreements also recited the witnesses had represented their testimony would be consistent with specific recorded statements made to the police. (*Id.* at pp. 455, 457.) Rejecting the contention the witnesses' testimony had been coerced to follow the prior statements, the court stressed that the witnesses were expressly obligated only to testify in accordance with the truth. The portions of the immunity agreements reciting expectations the witnesses' testimony would accord with their prior statements reflected the witnesses' and the prosecution's understanding that those statements had been truthful. But there was no agreement requiring the witnesses to reiterate the statements regardless of their truth, and therefore the testimony had been proper. (*Id.* at pp. 456-457.)

Here, in contrast, the emails show the prosecution conditioned the plea itself on defendant's accomplices relating specific facts, while also requiring they tell the truth at trial. To the trial court, Walsh's assertion he understood the facts included in the emails to be the truth was irrelevant. It clearly believed, conditioning the existence of a plea bargain on an accomplice's relation of specific facts placed the accomplice under a strong compulsion to testify in a specific way.

Even so, the prosecution's conduct does not rise to constitutional error. The plea bargains, the emails, and Philbrook's and Devencenzi's testimony all confirm the plea deal expressly required them to testify at trial to the truth. There was no explicit mention their testimony would be consistent with the statements attached to their plea agreements, even if those statements were the parties' understanding of the truth. We are unable to find a case analogous to that presented here and defendant fails to point us to one. Thus,

we must fall back on the rule announced in *Garrison* and *Boyer*: "[U]nless the bargain is expressly contingent on the witness sticking to a particular version [of events], the principles of *Medina* . . . are not violated." (*People v. Garrison*, *supra*, 47 Cal.3d at p. 771.) Of course, this does not preclude defendant from using the circumstances surrounding Philbrook's and Devencenzi's plea negotiations for impeachment purposes.

## C

*Substantial Evidence Supports The Trial Court's Findings*

*Potentially Exculpatory Evidence Was Lost Or Never Retained In Bad Faith*

The People argue the trial court's findings the government unconstitutionally muted interviews with Philbrook and Devencenzi, lost the recording of Amber's second interview, and lost photographs of Amber's shoes were erroneous because none of the lost evidence was exculpatory, defendant had reasonable means of obtaining comparable evidence, and none of the evidence was lost in bad faith. The People, however, fail to apply our standard of review. We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the substantial evidence standard. (*People v. Duff* (2014) 58 Cal.4th 527, 549, citing *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] & *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281].) Under this standard, we conclude the trial court's findings were not erroneous.

## 1

*Applicable Law*

" 'Due process does not impose upon law enforcement "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." ' [Citation.] At most, the state's obligation to preserve evidence extends to 'evidence that might be expected to play a significant role in the suspect's defense.' " (*People v. Duff*, *supra*, 58 Cal.4th at p. 549.) Whether the loss of evidence rises to the level of a due process violation is governed by the principles set forth by the United States Supreme Court in *Trombetta* and

33

*Youngblood*. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771.) Under *Trombetta*, law enforcement agencies must preserve evidence only if the evidence possesses exculpatory value that was apparent before it was destroyed and if the evidence is of a type not obtainable by other reasonably available means. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262; *California v. Trombetta*, *supra*, 467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422].) As an alternative to establishing the apparent exculpatory value of the lost evidence, *Youngblood* provides that a defendant may show that " 'potentially useful' " evidence was destroyed as a result of bad faith.[6] (*Velasco,* at p. 1262; see *Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58 [102 L.Ed.2d at p. 289].)

Although law enforcement officers have a duty to preserve exculpatory or potentially exculpatory evidence in their possession, "due process does not require the police to collect particular items of evidence. [Citation.] 'The police cannot be expected to "gather up everything which might eventually prove useful to the defense." ' " (*People v. Montes* (2014) 58 Cal.4th 809, 837 [no duty to collect blood samples]; *People v. Mills* (1985) 164 Cal.App.3d 652, 656 [no duty to collect breath samples]; see also *People v. Harris* (1985) 165 Cal.App.3d 324, 329 ["To date there is no authority for the proposition that sanctions should be imposed for a failure to *gather* evidence as opposed to a failure to preserve evidence"]; *People v. Bradley* (1984) 159 Cal.App.3d 399, 406 ["[W]e have found no cases of precedential value which squarely hold that the prosecution's duty to preserve material evidence encompasses an initial duty to

---

[6]     The People argue that because the trial court cited only *Trombetta* in its ruling, "the trial court's findings arose solely from *Trombetta*." We disagree. While the trial court may have cited only *Trombetta*, it found the excuses provided by the government as reasons for losing the evidence were "unpersuasive and not credible," thus making a bad faith finding on the part of the government. This finding demonstrates that while the trial court may not have cited *Youngblood*, it utilized the rule announced therein.

affirmatively collect or gather or seize potentially material evidence in the course of an investigation for defendant's use"].)

"It is axiomatic that the constitutional due process guaranty is a bulwark against improper state action. '[T]he core purpose of procedural due process [is] ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.' [Citation.] If the state took no action, due process is not a consideration, because there is no 'loss of evidence attributable to the Government.' " (*People v. Velasco*, *supra*, 194 Cal.App.4th at p. 1263.) Nevertheless, the California Supreme Court and United States Court of Appeals, Ninth Circuit, have at times suggested that there may be an appropriate case where the failure to collect evidence might warrant due process considerations. (*People v. Montes*, *supra*, 58 Cal.4th at p. 838 ["we have suggested that cases may arise in which the failure to collect evidence could justify sanctions against the prosecution at trial"]; *Miller v. Vasquez* (1989) 868 F.2d 1116, 1119 [sanctions for bad faith failure to collect evidence].)

2

*Philbrook's And Devencenzi's Interviews*

The People contend the prosecution's failure to audio record Philbrook's and Devencenzi's interviews is not a due process violation because the prosecution did not lose or destroy existing evidence as *Trombetta* and *Youngblood* prohibit. To the People, because there is no duty to compile evidence in a certain fashion, due process is not implicated as a matter of law. We disagree. The most important aspect to a due process claim is not the label placed on the government's failure, but the government's good or bad faith intent when the failure was made. The trial court's finding of bad faith when considered with the facts of this case provide substantial evidence to support the trial court's determination the prosecution violated due process by failing to audio record Philbrook's and Devencenzi's interviews.

The People cite *Wimberly* and *Von Villas* for the proposition that recording an interview is the act of creating evidence, as opposed to preserving or collecting existing evidence, and the failure to create evidence does not implicate due process concerns. (*People v. Von Villas* (1992) 10 Cal.App.4th 201; *People v. Wimberly* (1992) 5 Cal.App.4th 773.) The problem, however, with the People's reliance on *Wimberly* and *Von Villas* is that those courts cite to pre-*Trombetta* and/or *Youngblood* cases for the broad proposition that the government is under no duty to record interviews. (*Wimberly*, at p. 791, citing *People v. Murtishaw* (1981) 29 Cal.3d 733, 755, fn. 17; *People v. Kelley* (1984) 158 Cal.App.3d 1085, 1101-1102; *People v. Bradley*, *supra*, 159 Cal.App.3d at p. 403; *People v. Harris*, *supra*, 165 Cal.App.3d at p. 328 & *Von Villas*, at pp. 248-249, citing *People v. Dickerson* (1969) 270 Cal.App.2d 352, 360; *In re Gary* (1981) 15 Cal.App.3d 629, 640.)

A review of *Trombetta* and *Youngblood* demonstrate the intent of the government balanced with the harm to a defendant's ability to present a defense is key to whether a due process violation can be found, and a blanket rule protecting the government from failing to collect evidence is inappropriate. As explained in *Trombetta*, "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.' [Citation.] Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

"The most rudimentary of the access-to-evidence cases impose upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath. [Citing *Napue v. Illinois* (1959) 360 U.S.

36

264, 269-272 [3 L.Ed.2d 1217, 1220-1223].] But criminal defendants are entitled to much more than protection against perjury. A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. [Citation.] Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. [Citation.] The prosecution must also reveal the contents of plea agreements with key government witnesses . . . and under some circumstances may be required to disclose the identity of undercover informants who possess evidence critical to the defense . . . .

"Less clear from our access-to-evidence cases is the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession. On a few occasions, we have suggested that the Federal Government might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial. For instance, in *United States v. Marion* 404 U.S. 307, 324 (1971), and in *United States v. Lovasco* 431 U.S. 783, 795, n. 17 (1977), we intimated that a due process violation might occur if the Government delayed an indictment for so long that the defendant's ability to mount an effective defense was impaired. Similarly, in *United States v. Valenzuela-Bernal* [(1982) 458 U.S. 858], we acknowledged that the Government could offend the Due Process Clause of the Fifth Amendment if, by deporting potential witnesses, it diminished a defendant's opportunity to put on an effective defense." (*California v. Trombetta*, *supra*, 467 U.S. at p. 485-486 [81 L.Ed.2d at p. 420].)

We take from *Trombetta* that the constitutional mandate of due process promises more than the government's preservation or collection of evidence, it also promises not to unjustly hamper the defendant's preparation for trial and presentation of a defense. Thus, *Youngblood* refined the bounds of just government action. "The Due Process Clause of

37

the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, *supra*, at 486, that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." (*Arizona v. Youngblood*, *supra*, 488 U.S. at pp. 57-58 [102 L.Ed.2d at p. 289].)

Here, as the trial court observed, the suppression of the audio of Devencenzi's and Philbrook's interviews greatly hampered defendant's ability to present a defense. The case against defendant predominantly consisted of the testimony of his accomplices. Indeed, the only evidence tying defendant to the marijuana theft and murder was the testimony of Philbrook and Devencenzi relating the events of the crimes, Amber testifying to defendant's prior statement, and Sorce testifying to a prior statement of Philbrook. No physical evidence tied defendant to the scene of the crime, nor did the testimony of anybody independent of the conspiracy. Thus, any statements from Philbrook, Devencenzi, or Amber were highly relevant as impeachment evidence.

38

Indeed, here, the jury's estimate of the truthfulness and reliability of Philbrook, Devencenzi, and Amber was determinative of defendant's guilt or innocence. Philbrook's and Devencenzi's interviews occurred in anticipation of defendant's trial, it was not part of the initial investigation where the statements of witnesses and suspects may occur more informally or in haste. These interviews occurred for the government's purpose of prosecuting defendant at this trial and the practice was to record such interviews. The government's failure to audio record the interviews of Devencenzi and Philbrook served to paint the credibility picture of defendant's accomplices the government wanted the jury to accept. The impeachment potential of the audio of the interviews was clear at the time the interviews occurred and the audio was muted.

The People disagree and argue Investigator La Fountain's report of the interviews was reasonably comparable to the audio recordings, as was the opportunity to cross-examine those involved in the interviews. Given the trial court's bad faith finding, we disagree with the People. The trial court found the prosecution conditioned Devencenzi's and Philbrook's plea bargains on them relating specific facts that defendant was involved in the marijuana theft and was the person who murdered Zafft. After entering these pleas, the prosecution held an hour-and-one-half-long interview with each accomplice going over the story about the theft and murder without audio recording the interaction. The trial court found the prosecution "not credible" when offering excuses for muting the recording of Devencenzi's and Philbrook's interviews, thereby impliedly finding the government intentionally muted the audio of those interviews.

Given these acts of bad faith, not just in limiting the potential impeachment evidence of the interviews but also in suppressing the impeachment evidence in the emails regarding plea negotiations, a reasonably comparable source to the audio recording of the interviews must be left out of the government's narration. Similarly, Philbrook and Devencenzi suffer from credibility concerns ensuring an objective telling

39

of what occurred during the interviews cannot be reasonably entrusted to their testimony either.

In sum, Devencenzi's and Philbrook's credibility was significant to both the prosecution's and defendant's cases. The government knew this at the time it conducted interviews with Devencenzi and Philbrook and intentionally failed to audio record them. Combined with the prosecution's previous act of bad faith, the government's conduct of muting the audio to Philbrook's and Devencenzi's interviews rose to a due process violation. It is the level of bad faith that convinces us a violation occurred, i.e., this is a case the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. Thus, we conclude failing to make an audio recording under the facts of this case is within "reasonable bounds and confine[d] . . . to that class of cases where the interests of justice most clearly require it . . . ." (*Arizona v. Youngblood*, *supra*, 488 U.S. at pp. 58 [102 L.Ed.2d at p. 289].) Accordingly, substantial evidence supports the trial court's finding the government unconstitutionally muted the interviews with Philbrook and Devencenzi.

3

*Amber's Lost Interview And Photographs Of Her Shoes*

The trial court also made bad faith findings related to the loss of the recording of Amber's second interview and a picture of her shoe. The bad faith findings concerned Deputy Greene's inconsistent testimony regarding his handling of evidence practices and the prosecution's failure to address the alleged lost photo of Amber's shoe. We defer to these credibility findings.

As to the interview of Amber, we conclude substantial evidence supports the trial court's decision. Amber's credibility, as an accomplice to the marijuana theft, was significant to both the prosecution's and defendant's case. While Deputy Greene testified he lost the recording shortly after it was made, the trial court found him not credible. Thus, we cannot say the recording was lost shortly after it was made. It may have been

40

lost sooner to the preliminary hearing in June 2017 when Deputy Greene testified he discovered it was lost. At that time, Amber was the only witness who could provide information to the prosecution. Devencenzi and Philbrook had not pled guilty yet and the entire case rested on Amber's testimony and credibility, as well as the then-known evidence revealed from Philbrook's and Devencenzi's cell phone records. At that time, the potential evidentiary and impeachment value of Amber's interview was apparent to the government. And again, given the trial court's bad faith finding, we cannot look to the government to supply reasonably comparable evidence in the form of Deputy Greene's notes or report. Thus, substantial evidence supports the trial court's finding under *Youngblood* that the government unconstitutionally lost a recording of Amber's second interview.

As to the picture of Amber's shoe print, we conclude defendant carried his burden in demonstrating a photo was taken and then lost by pointing to indications in a police report the photo was taken and by the photo's absence from disclosed evidence. The government failed to address the issue, even though the trial court instructed it to do so, and the trial court interpreted that failure as a showing of bad faith. Given Amber's alleged accomplice status, the trial court found her shoe print could have been useful to compare to shoe prints taken from the scene of the murder. While the potential exculpatory nature of Amber's shoe print may seem low in light of the evidence elicited at trial, it is the bad faith finding that compels us to conclude substantial evidence supports the trial court's determination -- the government's conduct indicates the evidence could form a basis for exonerating defendant. (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58 [102 L.Ed.2d at p. 289].) These findings entitle the trial court to select from a plethora of remedial measures designed to cure the constitutional defect of the government's conduct.

## D

### *The Trial Court Did Not Abuse Its Discretion By Finding A Discovery Violation*

The People contend the trial court erroneously found the prosecution violated discovery rules by reviewing Philbrook's cell phone records during trial and discovering defendant's phone had connected with Philbrook's phone before and after the trip to California for the marijuana theft. As an initial matter, the People mischaracterize the trial court's findings as they relate to the discovery violation compared to the trial court's remedy. As the court stated when making its ruling on the discovery violation, the discovery violation was not the prosecution's late review of Philbrook's cell phone records but the search of defendant's cell phone records during trial and disclosure of the fruits of that search the morning it was to be testified to. The prosecution conceded this was a discovery violation and stipulated to exclusion of defendant's cell phone records. The trial court, however, further excluded the related evidence in Philbrook's phone records on the theory the discovery violation led to the further investigation of Philbrook's cell phone records and the incriminating evidence.

The trial court further found defendant would be significantly prejudiced by the surprise evidence given that reports completed by the prosecution gave the impression nothing of interest concerning defendant had been revealed in the 700 pages of cell phone records already disclosed. The trial court also found the prosecution was seeking a tactical advantage given that this type of search should have occurred long before it was presented as evidence or the prosecution should have told defendant what it had discovered instead of letting obvious misunderstandings flourish. Indeed, as the trial court noted, defendant stated in his opening statement there had been no communication between defendant and Philbrook and the prosecution never told the court or defendant the specific cell phone records it intended to focus on during testimony, even when asked. We see no abuse of discretion in the trial court's findings and chosen remedy. (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358 [the exclusion of evidence is not an appropriate

42

remedy in the absence of "a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial"].)

## II

### *Remand Is Appropriate*

Because we have concluded one of the trial court's findings was made in error, the People argue we must reverse the trial court's dismissal determination for lacking a supportive finding. We do not believe the issue so simple given the factual findings cited as supporting the trial court's dismissal order. The trial court pointed to multiple examples of the prosecution's conduct as articulated in its summary of violations to show its outrageous character. California Courts of Appeal occasionally have concluded that outrageous government conduct merited dismissal of criminal charges. (See *People v. Velasco-Palacios*, *supra*, 235 Cal.App.4th at p. 439 [affirming dismissal of criminal charges as sanction for outrageous government misconduct where prosecutor deliberately altered an interrogation transcript to include a confession and that misconduct prejudiced defendant's constitutional right to counsel]; *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1261 ["the court's conscience is shocked and dismissal is the appropriate remedy" where "the prosecutor orchestrates an eavesdropping upon a privileged attorney-client communication in the courtroom and acquires confidential information"]; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1007.) Where defendant's right to counsel is not implicated, however, dismissal for outrageous government conduct is warranted only where the conduct impairs a defendant's constitutional right to a fair retrial. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 841, 884-885 [holding that prosecutor's false testimony at hearing on motions to disqualify the district attorney and to dismiss did not constitute outrageous governmental conduct in violation of due process where there was no showing that the misconduct prevented defendant from receiving a fair trial]; see *United States v. Morrison*, *supra*, 449 U.S. at p. 365 [66 L.Ed.2d at pp. 568-569] ["Our approach has thus been to identify and then neutralize the taint by

43

tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial . . . . [T]here is no basis for imposing a remedy [of dismissal] in [a] proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial"].)

Here, the trial court believed a fair retrial impossible because the government conditioned defendant's accomplices' plea deals on them relating specific facts and then it intentionally inhibited a fact finder's ability to determine those accomplices' credibility by failing to disclose or properly document evidence a fact finder would rely on when performing its truth-finding function. The problem with the trial court's reasoning, however, is that the prosecution's interference with Philbrook's and Devencenzi's testimony is not of constitutional magnitude as the trial court believed. Thus, the credibility of Philbrook's and Devencenzi's testimony was not tainted beyond redemption but is reasonably left to the jury to determine. (*People v. Garrison*, *supra*, 47 Cal.3d at p. 771; *People v. Medina*, *supra*, 41 Cal.App.3d at pp. 454-456.) The question remains, however, as to whether defendant's accomplices' credibility can adequately be determined given the government's other constitutional violations.

It appears the trial court believed, as do we, that a fair retrial is possible since it did not order dismissal based on the other violations, but instead granted a mistrial. Thus, we shall remand the matter to the trial court because it is in the best position to fashion a remedy adequate to ensure defendant's fair trial in light of the upheld findings. (*People v. Jenkins* (2000) 22 Cal.4th 900, 951.) We note the Supreme Court's guidepost in this regard is that the trial court "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant . . . a fair trial." (*United States v. Morrison*, *supra*, 449 U.S. at p. 365 [66 L.Ed.2d at pp. 568-569].) To that end, the trial court must also deter future misconduct. (*Barber v. Municipal Court*, *supra*, 24 Cal.3d at p. 749; *People v. Velasco-Palacios*, *supra*, 235 Cal.App.4th at pp. 451-452.) Thus, the prosecuting agency or attorney assigned to defendant's case upon retrial may be of

relevant concern. (See *People v. Uribe, supra,* 199 Cal.App.4th at p. 881 [concluding there was no likelihood of future misconduct because a new prosecutor was assigned to the case and there was no showing of office-wide misconduct].)

DISPOSITION

The order of dismissal is reversed and the matter remanded to the trial court for further proceedings. The stay previously issued by this court, having served its purpose, will be vacated upon finality of this opinion.

/s/ _____
Robie, J.

We concur:

/s/ _____
Blease, Acting P. J.

/s/ _____
Hull, J.